1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT DALTON RUSH,

        Petitioner,

  v.

BEN CURRY,

        Respondent.

_____/

No. C 09-2266 CRB (PR)

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

      Pro se Petitioner Robert Dalton Rush, a state prisoner incarcerated at the Correctional Training Facility in Soledad, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging the California Board of Prison Hearings' ("BPH") September 25, 2007 decision to deny him parole at his fifth parole suitability hearing. Doc. #1 at 9. At the time he was denied parole in 2007, Petitioner had served ten years past his minimum eligible parole date of November 30, 1997 and four years beyond his express term of seventeen years. Id. To date, Petitioner has spent over twenty-five years in custody for his crime. Id.

      On October 16, 2009, the Court issued an Order to Show Cause why the writ should not be granted. Doc. #8. Respondent filed an Answer to the Order to Show Cause and Petitioner filed a Traverse. Doc. ## 9 & 11.

//

**United States District Court**
For the Northern District of California

After the matter was submitted, on April 22, 2010, the Ninth Circuit issued its decision in <u>Hayward v. Marshall</u>, 603 F.3d 546  (9th Cir. 2010) (en banc), which addressed important issues relating to federal habeas review of BPH decisions denying parole to California state prisoners.  On May 4, 2010, the Court ordered the parties to file supplemental briefing explaining their views as to how the <u>Hayward</u> en banc decision applies to the facts presented in Petitioner's challenge to BPH's decision denying him parole.  Doc. #12.  Respondent filed supplemental briefing on May 25, 2010, Doc. #13; Petitioner filed his supplemental briefing on June 3, 2010.  Doc. #14.

Having considered the entire record before the Court and all of the papers filed by the parties, the Court GRANTS the Petition.

## BACKGROUND

A.    <u>The Commitment Offense and Procedural History of Petitioner's Challenges to His September 25, 2007 Denial of Parole</u>

In October 1987, after a jury in San Bernardino County convicted Petitioner, then twenty-two years old, of second degree murder with an attached firearm enhancement, the trial court sentenced him to seventeen years-to-life in state prison.  Doc. #10-2 at 1; <u>see</u> Doc. #1 at 8–9.

On September 25, 2007, forty-two year-old Petitioner appeared before BPH for his fifth parole suitability hearing.  Doc. #1 at 9.  At that hearing, BPH read the following factual summary of the commitment offense as set forth in the state appellate court opinion affirming the judgment of the trial court, as follows:

> [Petitioner] and the victim, John Heinz . . . , along with others, were roommates in a residence in San Bernardino.  The pair became involved in a verbal and later physical confrontation over the purchase of dog food.  [Petitioner] became physically assaulted to the extent his left eye was blackened, was bruised and bloody.  At the conclusion of the physical confrontation, [Petitioner] returned to his room.  Heinz walked up and down the hallway, calling [Petitioner] names.  [Petitioner], while in his bedroom, obtained a loaded .22 caliber rifle and proceeded down the hallway toward the bathroom.  Before reaching the bathroom, [Petitioner] passed in front of Heinz's room.  The evidence before the jury at this stage was conflicting, the prosecution's evidence tending to show that [Petitioner], having made up his mind to shoot the victim, fired the rifle while the victim was on

2

1    the bed, while [Petitioner's] testimony was that the victim
2    advanced on him and was fatally wounded after failing to heed
     the warning to stop.  Subsequent to the shooting, [Petitioner]
3    enlisted the services of roommate Thomas Hoy . . . , and the two
     buried the body of Heinz in the deserted area near California
     State University, San Bernardino.  Hoy and [Petitioner] split the
4    money taken from the deceased person.  Hoy removed the ring
     the victim was wearing, pawned the ring, and split the proceeds
5    with [Petitioner].  Medical testimony suggested that the victim
     was shot numerous times, there having been 12 bullets or
6    fragments identified at the postmortem examination.

7    Doc. #10-2 at 9–11.

8        At the 2007 hearing, Petitioner declined to discuss the circumstances of the

9    commitment offense, which BPH acknowledged was his "statutory right," and assured him

10   that the exercise of this right would not be held against him.  Doc. #10-2 at 3.  At the

11   conclusion of the hearing, BPH again found Petitioner not suitable for parole and denied him

12   a subsequent hearing for one year.

13       Petitioner unsuccessfully challenged BPH's decision in the state superior, appellate

14   and supreme courts.  See Doc. #10-4 at 2; Doc. #10-13 at 2; Doc. #10-15 at 2.  After the

15   California Supreme Court summarily denied his petition for writ of habeas corpus on March

16   18, 2009, Petitioner filed the instant federal Petition for a Writ of Habeas Corpus.  Doc. #1.

17   B.   The September 25, 2007 Parole Suitability Hearing

18       During the evidentiary portion of the hearing, BPH noted that the psychologist who

19   prepared Petitioner's most recent psychological evaluation specifically for the 2007 hearing

20   found his risk of future violence was "in the low range when compared to similar inmates."

21   Doc. #10-2 at 14–15.  Petitioner's risk of future recidivism also was "rated in the low range"

22   and his level of psychopathy was "low."  Id. at 15.  In BPH's view, Petitioner's 2007

23   psychological evaluation was "favorable."  Id.

24       According to that same evaluation, which was submitted as evidence at Petitioner's

25   parole suitability hearing, the psychologist concluded under the category labeled

26   "Insight/Clinical":   "[Petitioner] would rate in the low range in his propensity for future

27   violence on this factor.  [Petitioner] does not have a negative attitude.  He does not have

28   active mental health symptoms, and he is not impulsive.  [Petitioner] has demonstrated a

United States District Court
For the Northern District of California

good response to treatment, and his insight seems very appropriate." Doc. #10-3 at 39 (emphasis in original). The psychologist arrived at this conclusion after asking why Petitioner committed the crime. As summarized by the psychologist after their discussion of the crime:

> When asked why he committed this crime, [Petitioner] stated it had to do with immaturity and lack of experience, and, in summary that he overreacted to a violent confrontation. [Petitioner] stated he was still recovering from a motorcycle accident that resulted in physical and emotional injury. He clarified that he was not aware at the time how much the stress was affecting him. [Petitioner] went on to say he was upset and depressed over losing his friend in the motorcycle accident and as a result was emotionally fragile and felt under a lot of pressure. [Petitioner] also stated he was overconfident due to having a loaded gun in the house at the time. He thought he could handle anything, and he underestimated himself here.

> When asked why he tried to cover up the crime, [Petitioner] stated he was ashamed and in denial. He was trying to convince himself that it [would] just go away. [Petitioner] stated, in retrospect, that it would have been better if he would have called the police and turned himself in right away.

> When asked if he was aware of any underlying issues involved, [Petitioner] stated he was not aware of any. [Petitioner] stated he was in shock at the time. He said, "At the time, it seemed like a petty argument for the roommate to get so violent. Once he attacked me and beat me up, I was overwhelmed. I overreacted."

> When asked why he did not choose another alternative, [Petitioner] said he was not thinking clearly. He was emotionally upset. He was looking for immediate protection. He did not discuss his feelings of anger at being beaten by his roommate.

> When asked why he used a weapon, [Petitioner] stated it was a .22 rifle that he had for target practice. Also, he had it for protection as someone had broken into one of his roommate's cars. [Petitioner] stated, "I never thought that I would use it." [Petitioner] also [stated], when the victim lunged at him, that he panicked and just started shooting the victim without thinking.

> When asked about his feelings regarding the loss of life and the impact on the victim's family, [Petitioner] stated the conflict between him and the victim hurt the family and all of their friends. It was irreversible and harmed everyone. In speaking of the victim's parents, [Petitioner] stated there is nothing worse than the death of a child.

> When asking [Petitioner] about how one makes restitution for something like this, [Petitioner] state[d], "I wish I really

4

United States District Court
For the Northern District of California

1    knew.  I try to be a positive influence and be the best person I
2    can."

3         When asked how he has changed so that something like
     this would not happen again, [Petitioner] stated he is more
4    humble now.  "I never thought that I was capable of something
     like this.  There's a better [perspective] on problems like this.  I
5    assume responsibility for myself before something like this
     happens."  [Petitioner] stated he believes he was too self-
6    absorbed before, and now he has a better understanding of the
     impact of his behavior on others.

7    Doc. #10-3 at 36–37.  Finally, the psychologist noted that Petitioner's five previous

8    psychological evaluations, dated June 28, 2005, October 18, 1999, August 2, 1996,

9    September 3, 1993 and October 19, 1990, all concluded that Petitioner's potential for

10   violence if released from prison was no more than that of the average citizen in the

11   community.  See Doc. #10-3 at 38.

12        BPH turned from the psychological evaluation and next noted Petitioner's educational

13   achievements while in prison, which included obtaining an Associates of Arts Degree from

14   Hartnell College in 1989, a Bachelor of Arts degree from San Jose State in 1990 and a

15   Master of Arts degree from Dominguez Hills State University in 1997.  Doc. #10-2 at 15–16.

16   In terms of his vocations while in prison, BPH noted Petitioner obtained a mechanical and

17   architectural drafting certificate of completion in 1996 and has "been for a considerable

18   amount of time a legal clerk in the central law library, and receives above average work

19   performance reports from his supervisors."  Id. at 16.

20        BPH then noted that Petitioner was not eligible for psychiatric treatment because he

21   had no mental illness.  Doc. #10-2 at 16.  Addressing Petitioner's participation in self-help

22   groups, BPH remarked, "this inmate has truly kept himself very busy and working towards

23   improving himself personally."  Id.  BPH then noted Petitioner's laudatory chronos

24   documenting his participation in the following programs since his last parole suitability

25   hearing in October 2005:  (1) Healing for the Angry Heart, laudatory chrono dated February

26   23, 2006; (2) Alcoholics Anonymous and Narcotics Anonymous, continuous participation

27   since 1993; laudatory chronos dated April 1, 2006, June 30, 2006, September 30, 2006,

28   December 31, 2006, and July 1, 2007; (3) Alternatives to Violence program – which is

5

**United States District Court**
For the Northern District of California

"designed to empower people to lead non-violent lives through affirmative respect for all, community building, cooperation and trust" – laudatory chronos dated October 24, 2006, November 15, 2006 – in which the associate warden stated Petitioner was "commended on the individual contributions to promoting a peaceful, non-violent program environment, and for continued interest in the . . . program" – and January 23, 2007; and (4) a June 28, 2007 informational chrono from the prison's senior librarian, which states: "[Petitioner] has shown himself to be a worker of considerable resource, reliability and quite consistent in the quality of his work, and he is able to interact effectively and harmoniously with both library workers and users. [Petitioner] has a well-[deserved] reputation for a low-key, [quiet] effectiveness." Id. at 16–19.

BPH next noted that, throughout Petitioner's twenty-year period of imprisonment, he had received no serious disciplinary violations and only one disciplinary infraction, which happened shortly after he was imprisoned. Doc. #10-2 at 19–20. Petitioner received that infraction for "failing to follow instructions," because he arrived at his prison work assignment fifteen minutes early, at 7:45 a.m. instead of 8:00 a.m. Id. at 20. Finally, BPH noted that Petitioner had solid parole plans that included a place to live and a firm offer of full-time employment in a construction business. Doc. #10-3 at 8–9.

BPH then offered Petitioner an opportunity to speak. Petitioner stated:

> First of all, I'd just like to say how very sorry I am for what I've done, and I realize I've hurt an awful lot of people, far more than I ever could have imagined at the time. And I also take full responsibility for what I've done. I make no excuses. There's no excuse for what happened. Everything I've said in the past and talked with the psychologists about as far as my maturity and the stress that I was under at the time, I said that it's by way of explanation and insight into what was going on, not as an excuse or, you know, for what I've done. I also recognize that saying I'm sorry isn't enough and will never be enough. I realize I needed to change who I was. I needed to grow up, and I needed to do everything possible to improve myself to ensure nothing like this would ever happen again, and I think I've learned to do that. I learned how to handle confrontation in here. I've learned how to associate with the right people. I've learned how to have the right attitude and how to make the right decisions. I spent [sic] half my life in here now. I'm not a kid anymore. I'm an adult. I take responsibility for my situation. I take responsibility for my decisions. I realize that there's a different set of problems and situations out on the street than dealing with here in an

United States District Court
For the Northern District of California

1        institution, but I'm confident with the support of my family and
       friends I can contribute to society, and by contributing to society,
2        perhaps make amends in some way for what I've done. And I
       hope you'll give me that opportunity. Thank you.

Doc. #10-3 at 12–13.

      In attendance at Petitioner's 2007 parole suitability hearing were the murder victim's

mother, father, two sisters and brother-in-law. Doc. #10-1 at 37–38. Following Petitioner's

statement, the victim's mother and older sister both spoke with justifiable passion against

Petitioner's release immediately before BPH adjourned to render its decision. Doc. #10-3 at

13–20.

      When BPH reconvened the hearing, BPH told Petitioner "we are going to deny you

parole for a period of one year. A period of one year was selected as you have accomplished

many things throughout your incarceration, and we believe that recognition should be given

for your accomplishments." Doc. #10-3 at 21. Nonetheless, BPH explained, "we are finding

that as of today's date, you are not suitable as you would pose an unreasonable risk of danger

to society or a threat to public safety if released from prison." Id.

      BPH proceeded to note the factors favoring a finding of Petitioner's parole suitability,

which included Petitioner's lack of any criminal history as an adult or juvenile, his stable

social history in that he "[came] from a good home," that he had "acceptable" parole plans

and his "remarkable" behavior while in prison. Doc. #10-3 at 21–22. But then BPH went

back to the facts of the commitment offense, reiterating them in great detail, all of which

"indicate[d] to this Panel that [Petitioner] truly [does] not have remorse [or] . . .

understanding or appreciation for the acts that resulted in murder. . . ." Doc. #10-3 at 22–26.

BPH stated that "[i]t is difficult for this Panel to conclude that you have accepted

responsibility under the totality of the circumstances. Your personal growth is difficult to

assess in view of your continued minimization of your responsibility in the commission of

this murder." Id. at 26. BPH further stated that when Petitioner spoke about his remorse for

what he had done, he "said those statements in a flat affect, with not a whole lot of emotional

7

**United States District Court**
For the Northern District of California

1  commitment as far as this Panel member's observations, and I believe he over-summarized

2  and over-simplifies the entire situation." Id. at 29.

3       Notwithstanding BPH's earlier recognition that Petitioner "has truly kept himself very

4  busy and working towards improving himself personally," see Doc. #10-2 at 16, BPH

5  recommended that before he could be found suitable for parole, Petitioner needed to

6  participate in more self-help programming. According to BPH, Petitioner needed "therapy in

7  order to face, discuss and understand and cope with stress in a non-destructive manner. Until

8  progress is made, you continue to be unpredictable and a threat to others." Id. at 26. In

9  response, Petitioner informed BPH that "[t]here are no other programs available here. I

10  participated in every available program." Doc. #10-3 at 28. BPH countered that Petitioner

11  should "get books on anger management" and participate in self-study. Id. at 28–29.

12  Petitioner again attempted to explain that despite his interest and attempts at pursuing

13  continued programming, it was unavailable to him:

14          I just have one concern. In the past, Panels have recommended
            therapy to continue, and I've tried to pursue it. And there should
15          be a chrono in my C-File saying as such, where Dr. Tirini . . .
            says there is no therapy available in the system, and if it was
16          available, it would only be available on the recommendation of a
            psychologist.
17
            . . . .
18
            There's also a chrono in there from previous hearings where I've
19          done [self-study] as well. There's a program where I read the
            book The Road Less Traveled and wrote a book report on it. . . .
20          And so I tried to comply with all of these recommendations from
            past Boards and – [] there's nothing left.
21

22  Id. at 29. BPH then concluded the hearing.

23  C.   The State Court Decision Regarding Petitioner's Challenge to BPH's September 25,
         2007 Denial of Parole
24

25       The state superior court upheld BPH's decision to deny Petitioner parole, stating:

26          Despite petitioner's good record while incarcerated this court
            finds that ample evidence supports the decision to deny parole
27          suitability. The circumstances of the murder petitioner
            committed including the sociopathic manner of his actions after
28          the crime clearly indicates that petitioner is a person clearly
            capable of committing the most heinous crimes with coolness and

8

1    lack of remorse.  Such persons present a danger to the
     community.  The Board did not abuse its discretion in finding
2    that petitioner needs more therapy to understand that what he did
     is to take the life of another human being for his own petty
3    satisfaction.  Until such understanding is real and manifest,
     parole suitability can justifiably be denied.

4

5    Doc. #10-4 at 2.

6                              **LEGAL STANDARD**

7        In <u>Hayward</u>, the Ninth Circuit explained the law in California as it relates to parole

8    suitability determinations:

9            The California parole statute provides that the Board of
         Prison Terms "shall set a release date unless it determines that the
10       gravity of the current convicted offense or offenses, or the timing
         and gravity of current or past convicted offense or offenses, is
11       such that consideration of the public safety requires a more
         lengthy period of incarceration for this individual."   The crucial
12       determinant of whether the prisoner gets parole in California is
         "consideration of the public safety."
13
             In California, when a prisoner receives an indeterminate
14       sentence of fifteen years to life, the "indeterminate sentence is in
         legal effect a sentence for the maximum term, subject only to the
15       ameliorative power of the [parole authority] to set a lesser term."
         Under the California parole scheme, the prisoner has a right to a
16       parole hearing and various procedural guarantees and rights
         before, at, and after the hearing; a right to subsequent hearings at
17       set intervals if the Board of Prison Terms turns him down for
         parole; and a right to a written explanation if the Governor
18       exercises his authority to overturn the Board of Prison Terms'
         recommendation for parole.  Under California law, denial of
19       parole must be supported by "some evidence," but review of the
         [decision to deny parole] is "extremely deferential."
20

21   <u>Hayward</u>, 603 F.3d at 561–62 (footnotes and citations omitted).

22       The court further explained:

23           Subsequent to Hayward's denial of parole, and subsequent
         to our oral argument in this case, the California Supreme Court
24       established in two decisions, <u>In re Lawrence</u> . . . and <u>In re
         Shaputis</u>, . . . that as a matter of state law, "some evidence" of
25       future dangerousness is indeed a state <u>sine qua non</u> for denial of
         parole in California.  We delayed our decision in this case so that
26       we could study those decisions and the supplemental briefs by
         counsel addressing them.  As a matter of California law, "the
27       paramount consideration for both the Board [of Prison Terms]
         and the Governor under the governing statutes is whether the
28       inmate currently poses a threat to public safety." . . .   There must
         be "some evidence" of such a threat, and an aggravated offense

                                      9

**United States District Court**
For the Northern District of California

1   "does not, in every case, provide evidence that the inmate is a
2   current threat to public safety." . . . The prisoner's aggravated
    offense does not establish current dangerousness "unless the
3   record also establishes that something in the prisoner's pre- or
    post-incarceration history, or his or her current demeanor and
4   mental state" supports the inference of dangerousness. . . . Thus,
    in California, the offense of conviction may be considered, but
5   the consideration must address the determining factor, "a current
    threat to public safety."

6   <u>Hayward</u>, 603 F.3d at 562 (footnotes and citations omitted).

7       After providing this background on California law as it applies to parole suitability

8   determinations, the court then explained the role of a federal district court charged with

9   reviewing the decision of either BPH or the governor denying a prisoner parole.  According

10  to the Ninth Circuit, this Court must decide whether a decision "rejecting parole was an

11  'unreasonable application' of the California 'some evidence' requirement, or was 'based on

12  an unreasonable determination of the facts in light of the evidence.'"  <u>Hayward</u>, 603 F.3d at

13  562–63 (citations omitted); <u>see also</u> <u>Cooke v. Solis</u>, 606 F.3d 1206, 1208, n. 2 & 1213 (9th

14  Cir. 2010), (<u>petition for cert. filed</u>, (U.S. Sept. 2, 2010) (No. 10-333) (applying <u>Hayward</u> and

15  explicitly rejecting the state's argument that "the constraints imposed by [the Antiterrorism

16  and Effective Death Penalty Act ("AEDPA")] preclude federal habeas relief" on petitioner's

17  claim; noting that in <u>Hayward</u>, the court "held that due process challenges to California

18  courts' application of the 'some evidence' requirement are cognizable on federal habeas

19  review under AEDPA").

20                                    **DISCUSSION**

21  A.    <u>California Law Regarding Parole Suitability Determinations</u>

22       When assessing whether the California parole board's suitability determination was

23  supported by "some evidence," the Court's analysis is framed by the "regulatory, statutory

24  and constitutional provisions that govern parole decisions in California."  <u>Cooke</u>, 606 F.3d at

25  1213 (citing <u>In re Rosenkrantz</u>, 29 Cal. 4th 616 (2002)); <u>see</u> <u>Hayward</u>, 603 F.3d at 561–62.

26  Under California law, prisoners serving indeterminate life sentences, like Petitioner, become

27  eligible for parole after serving minimum terms of confinement required by statute.  <u>In re</u>

28  <u>Dannenberg</u>, 34 Cal. 4th 1061, 1069–70 (2005).  Regardless of the length of the time served,

**United States District Court**
For the Northern District of California

"a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a). In making this determination, BPH must consider various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release. See Cal. Code Regs. tit. 15, § 2402(b)–(d).

In considering the commitment offense, BPH must determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." Cal. Code Regs. tit. 15, § 2402(c)(1). The factors to be considered in making that determination include: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents; (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) The victim was abused, defiled or mutilated during or after the offense; (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) The motive for the crime is inexplicable or very trivial in relation to the offense." Id.

As the Ninth Circuit observed in Hayward, the California Supreme Court has held that, "the core statutory determination entrusted to the Board and the Governor [in determining a prisoner's parole suitability] is whether the inmate poses a current threat to public safety . . . ." In re Lawrence, 44 Cal. 4th 1181, 1191 (2008). And, "the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." Id. at 1205 (emphasis in original) (citing Rosenkrantz, 29 Cal. 4th 616 and Dannenberg, 34 Cal. 4th 1061). The court further explained that:

> a parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." . . . These factors are designed to guide an assessment of the inmate's threat to society, if released, and hence could not logically relate to anything but the threat currently posed by the inmate.

Lawrence, 44 Cal. 4th at 1205–06 (citations omitted).  The relevant inquiry, therefore, is:

> whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense.  This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.

In re Shaputis, 44 Cal. 4th 1241, 1254–55 (2008).

The evidence of current dangerousness "must have some indicia of reliability."  In re Scott, 119 Cal. App. 4th 871, 899 (2004) (Scott I).  Indeed, "the 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact."  In re Scott, 133 Cal. App. 4th 573, 590, n. 6 (2005) (Scott II).

Subsequent to Hayward, the Ninth Circuit issued decisions in Cooke, 606 F.3d 1206, and Pirtle v. California Board of Prison Terms, 611 F.3d 1015, 1025  (9th Cir. 2010), both of which focused on the notion that the "some evidence" of current dangerous must be reliable.  In Cooke, the court ultimately reversed the district court's denial of Cooke's challenge to BPH's decision denying him parole, finding that BPH's stated reasons for denying parole did not support the conclusion that Cooke posed a current threat to public safety.  Cooke, 606 F.3d at 1216.  Specifically, the court stated:

> [E]ach of the Board's findings . . . lacked any evidentiary basis.  Nothing in the record supports the state court's finding that there was "some evidence" in addition to the circumstances of the commitment offense to support the Board's denial of Petitioner's parole.  The Parole Board's findings were individually and in toto unreasonable because they were without evidentiary support.  When habeas courts review the "some evidence" requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings.  Here, there was no evidence that reasonably supports either the necessary subsidiary finding or the ultimate "some evidence" finding.  Accordingly, we hold that the state court decision was "'based on an unreasonable determination of the facts in light of the evidence.'"  Hayward, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(2)).  Cooke is entitled to a writ of habeas corpus.

United States District Court
For the Northern District of California

1    Id.; see also Pirtle, 611 F.3d at 1025 (affirming the district court's decision to grant habeas

2    relief, concluding:  "[i]n sum, there is no evidence in the record to support the Board's

3    finding that Pirtle poses a current threat to public safety.  The Board's stated reasons for the

4    denial of parole either lacked evidentiary support, had no rational relationship to Pirtle's

5    current dangerousness, or both").

6    B.    Analysis of Petitioner's Claim

7           Unlike the state appellate and supreme courts, which summarily denied Petitioner

8    relief, see Doc. #10-13 at 2; Doc #10-15 at 2, the state superior court provided a reasoned

9    decision in concluding Petitioner was not entitled to habeas relief.  See Doc. #10-4 at 2–3.  It

10   is that decision, therefore, that the Court analyzes under AEDPA.  See Ylst v. Nunnemaker,

11   501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005)

12   (last reasoned decision constitutes an "adjudication on the merits" for purposes of 28 U.S.C.

13   § 2254(d) if the court resolved the rights of the parties based on the substance of the claim,

14   rather than on the basis of a procedural or other rule that precluded the state court from

15   reviewing the merits).  As explained below, the Court finds that the state court's approval of

16   BPH's decision to deny Petitioner parole was an unreasonable application of the California

17   "some evidence" standard, and was based on an unreasonable determination of the facts in

18   light of the evidence presented in the state courts.  See Hayward, 603 F.3d at 562–63.

19          As the superior court noted in its decision, in finding Petitioner unsuitable for parole,

20   BPH focused on the facts of the commitment offense itself, as well as the "over-summarized"

21   and "over-simplifie[d] manner in which Petitioner expressed his remorse, which involved a

22   "flat affect with not a whole lot of emotional commitment as far as this Panel member's

23   observations."  Doc. #10-3 at 29.  The superior court concluded there was "ample evidence"

24   for BPH to deny Petitioner parole.  Doc. #10-4 at 3.  In support of its decision, the court

25   observed:  "[t]he circumstances of the murder Petitioner committed including the sociopathic

26   manner of his actions after the crime clearly indicates that petitioner is a person clearly

27   capable of committing the most heinous crimes with coolness and lack of remorse.  Such

28   persons present a danger to the community."  Doc. #10-4 at 3.

**United States District Court**
For the Northern District of California

1    With these words, the state superior court implicitly found – and rightly so – that <u>at</u>

2    <u>the time of the commitment offense</u>, Petitioner presented a danger to the community.

3    Notably absent from the court's decision, however, is a statement that over twenty years

4    later, Petitioner posed a <u>current</u> risk of danger to society.  But this is precisely what is

5    required under California law to support a finding of parole unsuitability.  <u>See</u> <u>Lawrence</u>, 44

6    Cal. 4th at 1205–06; <u>Shaputis</u>, 44 Cal. 4th at 1254–55.  Indeed, as the California Supreme

7    Court explained in <u>Lawrence</u>:

8            the aggravated nature of the crime does not in and of itself
             provide some evidence of current dangerousness to the public
9            unless the record also establishes that something in the prisoner's
             pre- or post-incarceration history, or his or her <u>current demeanor</u>
10           <u>and mental state</u>[] indicate[] that the implications regarding the
             prisoner's dangerousness that derive from his or her commission
11           of the commitment offense remain probative to the statutory
             determination of a continuing threat to public safety.

12

13   <u>Lawrence</u>, 44 Cal. 4th at 1214 (emphasis added).  Here, all six of Petitioner's psychological

14   evaluations, dating from 1990 through 2007, concluded that he posed no more of a risk of

15   danger to society than the average person in the community.  Even BPH recognized that

16   Petitioner's most recent psychological evaluation, which discussed his insight into and

17   remorse for the crime, was "favorable."  Here, as in <u>Pirtle</u>, "[t]he record contains no <u>evidence</u>

18   that contradicts [the] professional assessment [of the psychologist who concluded the

19   petitioner] was neither unstable [n]or potentially dangerous."  <u>Pirtle</u>, 611 F.3d at 1025

20   (emphasis added).   Rather, the record shows that what BPH relied on to counter the

21   psychological evaluation were the "observations" of one panel member that Petitioner's

22   insight and remorse could not have been sincere, because when Petitioner spoke about his

23   remorse for what he had done, he "said those statements in a flat affect, with not a whole lot

24   of emotional commitment."

25           But a panel member's "observations" regarding Petitioner's demeanor at a parole

26   suitability hearing, standing alone – but especially here, where six psychological evaluations

27   found Petitioner's demeanor and mental state unremarkable – do not provide the necessary

28   rational nexus establishing "some evidence" that Petitioner would pose a current threat to

United States District Court
For the Northern District of California

1    society if released from prison.  Lawrence, 44 Cal. 4th at 1227 (mere recitation of the

2    circumstances of the commitment offense, absent articulation of a rational nexus between

3    those facts and current dangerousness, fails to provide the required "modicum of evidence"

4    of unsuitability").  Indeed, as the California Supreme Court noted in Lawrence, "[i]f simply

5    pointing to the existence of an unsuitability factor . . . were sufficient to establish that a

6    parole decision was . . . supported by 'some evidence,'" this Court, like any reviewing court,

7    "would be forced to affirm any denial-of-parole decision linked to the mere existence of

8    certain facts in the record, even if those facts have no bearing on the paramount statutory

9    inquiry."  Lawrence, 44 Cal. 4th at 1211 (citing Rosenkrantz, 29 Cal.4th. at 664); see also

10   Scott I, 119 Cal. App. 4th at 898 (observing that the deferential standard of review set forth

11   in Rosenkrantz, although requiring courts to be "exceedingly deferential" to the Board's

12   findings, "does not convert a court reviewing the denial of parole into a potted plant").

13          In rendering its decision, BPH noted the many factors that favored a finding that

14   Petitioner was suitable for parole, including the absence of any criminal history as an adult or

15   juvenile, Petitioner's stable social history in that he "[came] from a good home," that he had

16   "acceptable" parole plans and his "remarkable" behavior while in prison.  Doc. #10-3 at

17   21–22.  These are proper factors to consider in assessing a Petitioner's suitability for parole.

18   See Cal. Code Regs. tit. 15, § 2402(d).  Further, even BPH recognized with respect to

19   Petitioner's participation in self-help programming, "[Petitioner] has truly kept himself very

20   busy and working towards improving himself personally."  Doc. #10-2 at 16.

21          After careful review of the factual record and relevant law, the Court finds that at the

22   time of his 2007 parole suitability hearing, there simply was no reliable evidence to suggest

23   that Petitioner would pose an unreasonable and current risk of danger to society or threat to

24   public safety if released from prison.  See Hayward, 603 F.3d at 561–62; Lawrence, 44 Cal.

25   4th at 1191, 1205–06; Cal. Code Regs. tit. 15, § 2402(a).  As a result, the Court finds that the

26   state court's approval of BPH's decision to deny Petitioner parole was an unreasonable

27   application of the California "some evidence" standard, and was based on an unreasonable

28   determination of the facts in light of the evidence presented in the state courts.  See Hayward,

1   603 F.3d at 562–63.  Petitioner therefore is entitled to federal habeas relief.  See Cooke, 606

2   F.3d at 1216; Pirtle, 611 F.3d at 1025.

3                                          **CONCLUSION**

4          For the reasons set forth above, the Petition for a Writ of Habeas Corpus is

5   GRANTED.  Within thirty (30) days from the date of this order, Respondent either must:  (1)

6   set a parole date for Petitioner, see Pirtle, 611 F.3d at 1025; or (2) present to this Court new

7   evidence, arising after Petitioner's September 2007 parole suitability hearing, of Petitioner's

8   current dangerousness.  Within  thirty (30) days thereafter, Respondent must file a notice

9   with the Court confirming the parole date.  Within seven (7) days after the parole date has

10  been set, Respondent must file a notice with the Court indicating whether Petitioner has been

11  released on parole.  The Court retains jurisdiction to enforce its Order.

12         The Clerk of Court shall enter Judgment in favor of Petitioner and close the file.

13

14         SO ORDERED.

15

16  DATED: September 27, 2010      _____
                                    CHARLES R. BREYER
17                                  United States District Judge

18

19

20

21

22

23

24

25

26

27

28  G:\PRO-SE\CRB\HC.09\Rush-09-2266-bph-grant-post hawyard.wpd

United States District Court
For the Northern District of California